IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAURIE L. OPELT,              ) | |
|                               ) | |
|         Plaintiff,            ) | |
|                               ) | Civil Action No. 07-63 Erie |
|                               ) | |
|         v.                    ) | |
|                               ) | |
| MICHAEL J. ASTRUE,            ) | |
| Commissioner of Social Security, ) | |
|                               ) | |
|         Defendant.            ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

  Plaintiff, Laurie L. Opelt, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. Opelt filed an application for DIB on June 21, 2004, alleging disability since May 18, 2004, due to bi-polar disorder (Administrative Record, hereinafter "AR", 72-75; 91). Her application was denied, and Opelt requested a hearing before an administrative law judge ("ALJ") (AR 49-53). A hearing was held before an administrative law judge ("ALJ") on August 24, 2005, and following this hearing, the ALJ found that Opelt was not entitled to a period of disability or DIB under the Act (AR 39-43; 314-350). The Appeals Council granted Opelt's request for review and remanded the case to the ALJ for further administrative proceedings (AR 64-67).

  The ALJ conducted a subsequent hearing on May 10, 2006 (AR 286-313). On September 28, 2006, the ALJ again found that Opelt was not entitled to a period of disability or DIB under the Act (AR 13-20). Her request for review by the Appeals Council was denied (AR 5-8), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will deny Plaintiff's motion and grant

1

Defendant's motion.

## I. Background[1]

Opelt was born on July 4, 1964, and was 39 years old at the time of her alleged onset of disability (AR 19). She is a high school graduate, with past relevant work experience as a cashier (AR 92; 97).

Opelt was treated by Frank Yohe, M.D., a psychiatrist since 1989. On October 23, 2003 Dr. Yohe reported that her affect was blunted, her speech was spontaneous and she had no paranoia, delusions or psychosis (AR 193).

On December 4, 2003, Opelt reported that she was doing well until two days previous when she suffered an increase in paranoia following a conversation with her mother and sister (AR 192). She further reported that she suffered from paranoia at work, but was still able to work (AR 192). Dr. Yohe noted her mood was anxious and her affect was blunted and adjusted her medications (AR 192).

When Opelt returned to Dr. Yohe on January 5, 2004, she reported that her paranoia was gone and work was "ok" but she was sleeping a lot at home (AR 191). On mental status examination, Dr. Yohe reported that her affect was blunted, her speech was spontaneous and she had no delusions or psychosis (AR 191). Her Zyprexa dosage was decreased and she was started her on Paxil (AR 191).

On February 5, 2004, Opelt reported less paranoia but claimed that concentration and tiredness were still a problem (AR 190). She further reported that her paranoia increased when her Zyprexa dosage was decreased (AR 190). Dr. Yohe reported that her affect was flat, her speech was spontaneous and she had mild paranoia (AR 190). When she returned on March 5, 2004, she reported better concentration and decreased paranoia (AR 189). Dr. Yohe noted only mild paranoia (AR 189). On April 9, 2004, Dr. Yohe reported that Opelt had no paranoia, and

---

[1] Opelt only challenges the ALJ's findings with respect to her alleged mental impairments; we therefore confine our recitation of the evidence and discussion accordingly.

she reported that she was able to concentrate at work (AR 188).

When Opelt returned to Dr. Yohe on June 8, 2004, she stated she had quit working due to "too much stress" and "paranoia" (AR 187). Dr. Yohe noted that she suffered from mild paranoia, and had poor concentration and energy (AR 187). He increased her Zyprexa dosage (AR 187). On July 1, 2004, Opelt was only "slightly paranoid" and was babysitting for the first time that day (AR 186). Dr. Yohe reported her affect was full, her speech was spontaneous and her concentration was "ok" (AR 186).

Dr. Yohe submitted a report dated July 14, 2004 stating that Opelt suffered from bipolar disorder with episodic psychosis and was unable to tolerate much stress (AR 160). He further reported that she had been hospitalized approximately four to five times in the past for her mental condition, most recently in 2003 (AR 160). When last seen in July 2004, she was slightly withdrawn with decreased psychomotor activity and was mildly depressed with a flat affect (AR 161). Dr. Yohe reported that her stream of thought was goal directed, she had no hallucinations or delusions and was not suicidal, although she frequently had paranoid delusions (AR 161). He found she had average intelligence but had poor concentration; her memory and judgment were "ok;" her impulse control was good; and her insight was fair (AR 161-162). Dr. Yohe opined that when she was symptomatic, she had great difficulty in performing activities of daily living (AR 163). He further indicated that she had difficulty interacting with others because she became quite paranoid (AR 163). He believed at that time her prognosis was fair (AR 163-164).

Dr. Yohe also completed a Medical Source Statement on July 14, 2004 and opined that Opelt was slightly limited in her ability to understand, remember and carry out short instructions and interact appropriately with co-workers; markedly limited in her ability to understand, remember and carry out detailed instructions; and moderately limited in her ability to make judgments on simple work-related decisions, interact appropriately with the public and supervisors, and respond appropriately to work pressures and changes in a work setting (AR 165). He noted that Opelt often had poor concentration and became paranoid (AR 165).

On July 27, 2004 Opelt returned to Dr. Yohe and reportedly felt "pretty good" except for increased tiredness (AR 185). She was still babysitting a friend's child, and Dr. Yohe noted she had "min[imal] if any paranoia" (AR 185).

On August 3, 2004, Richard Heil, Ph.D., a state agency reviewing psychologist, reviewed the psychological evidence of record and concluded that Opelt was not significantly limited in a number of work-related areas, and was only moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; accept instructions and respond appropriately to criticism; and set realistic goals (AR 181). Dr. Heil adopted the conclusions in Dr. Yohe's July 14, 2004 assessment, and concluded that Opelt was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment (AR 182).

On September 29, 2004, Dr. Yohe reported Opelt had "min[imal] paranoia" and was able to clean and work around the house (AR 184). He assigned her a Global Assessment of Functioning ("GAF") score of 50 (AR 184).[2]

Opelt reported on November 9, 2004 that she was discouraged at times, was depressed and slept a lot, but was not paranoid (AR 233). Dr. Yohe discussed ways she could spend her days and suggested she volunteer at the Red Cross (AR 233). He assigned her a GAF score of 55 (AR 233).[3] On December 27, 2004, Opelt reported that her only problem was "tiredness" (AR

---

[2]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

[3]Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational,

232). Dr. Yohe assigned her a GAF score of 55 (AR 232).

Opelt returned to Dr. Yohe on February 22, 2005 and reported she was not as tired, had no psychosis or paranoia and missed working (AR 231). On mental status examination, Dr. Yohe reported that her mood was euthymic, her affect was full, her speech was spontaneous and her concentration and energy were "ok" (AR 231). Dr. Yohe assigned her a GAF score of 60 and noted that her prognosis was good (AR 231). On June 13, 2005, Opelt reported that she was occasionally depressed and slept a lot, but her mental status examination and GAF score remained unchanged (AR 230).

Dr. Yohe wrote a letter to Opelt's attorney on August 3, 2005 summarizing her treatment history (AR 224). Dr. Yohe indicated that Opelt suffered from schizoaffective disorder which was manifested by symptoms of extreme paranoia with delusions and severe depression when ill (AR 224). When her symptoms were mild however, she was able to perform household chores (AR 224). Dr. Yohe stated that she had difficulty concentrating for any length of time, and for the past two to three years, had been able to tolerate only minimal stress without decompensation (AR 224). Dr. Yohe noted that although she had tried to work as a cashier, she was unable to tolerate the stress and developed symptoms that caused her to stop working (AR 224). He considered her "disabled for any gainful employment" (AR 224).

On a Medical Source Statement form dated August 3, 2005, Dr. Yohe opined that Opelt was slightly or moderately limited in her ability to perform work-related mental activities, markedly limited in her ability to deal with the public and understand, remember and carry out complex job instructions and extremely limited in her ability to deal with work stresses (AR 225-226). He concluded that she was "unable to work" (AR 227).

Opelt was evaluated by Gregory Richards, M.D., a psychiatrist, on November 9, 2005 following Dr. Yohe's retirement (AR 263-265). On mental status examination, Dr. Richards reported that she was alert, anxious, neatly dressed and had an appropriate affect (AR 264). Her

---

or school functioning (e.g., few friends, conflicts with peers and co-workers)." *Id.*

concentration was within normal limits, her thoughts were goal directed, there was no evidence of active thought disorder, her insight and judgment were within normal limits and she denied suffering from any hallucinations or delusions (AR 264).  Dr. Richards diagnosed her with bipolar disorder, adjusted her medications and assigned her a GAF score of 50 (AR 264).

On May 3, 2006, Dr. Richards completed a Medical Source Statement form and opined that Opelt was only slightly limited in her ability to follow work rules, use judgment, maintain personal appearance and demonstrate reliability; was moderately limited in her ability to relate to co-workers, deal with the public, use judgment, maintain attention/concentration, understand, remember and carry out simple job instructions, behave in an emotionally stable manner and relate predictably in social situations; was markedly limited in her ability to function independently and understand, remember and carry out detailed job instructions; and was extremely limited in her ability to interact with supervisors, deal with work stresses and understand, remember and carry out complex job instructions (AR 266-267).  Dr. Richards noted that work stress and being around people increased Opelt's symptoms of paranoia (AR 266-267).  Dr. Richards opined that she could work in a sheltered noncompetitive workplace (AR 268).

Opelt underwent a clinical psychological disability evaluation on May 15, 2006 performed by Glenn W. Thompson, Ph.D., pursuant to the request of the Commissioner (AR 271-281). Opelt reported she discontinued working in December 2004 due to paranoid symptoms (AR 273).  She further reported that her medications were "working pretty well," she no longer slept excessively, was more energetic, was able to run errands, perform household chores and interact more frequently with family and friends (AR 273).  On mental status examination, Dr. Thompson found Opelt was very cooperative and friendly and noted that she described herself as "happy" (AR 276).  He further noted that her paranoid ideations were controlled "quite well" with medication (AR 276-277).  Dr. Thompson found her concentration was significantly compromised while performing serial 7 subtraction, but her memory was intact and her judgment was "quite good" (AR 277-278).  Dr. Thompson diagnosed her with schizoaffective disorder and

assigned her a GAF score of 65-70 on her current regimen (AR 278).[4]

In connection with his examination, Dr. Thompson also completed a Medical Source Statement and concluded that Opelt's ability to understand and carry out instructions and make judgments on simple work-related decisions was moderately impaired (AR 279). He further concluded that she was only slightly impaired in her ability to interact with co-workers, moderately impaired in her ability to interact with her supervisor and respond appropriately to changes in a routine work setting, and markedly impaired in her ability to interact appropriately with the general public (AR 280). Dr. Thompson found that her ability to respond to work pressure was markedly impaired, but stated it was "unknown" how she would function under minimal stress (AR 279-280).

Opelt testified at both hearings held by the ALJ on August 24, 2005 and May 10, 2006 (AR 286-350). At the first hearing, Opelt testified that she continued to occasionally use marijuana even though her doctors had told her it would aggravate her symptoms (AR 322). She further testified that she was treated by Dr. Yohe approximately once every two months for symptoms of paranoia (AR 326). She was able to care for her own personal needs without assistance, prepare herself a meal, wash dishes and do laundry, but her husband helped with the household chores (AR 326; 328-329). She was able to go a restaurant once a week and visit with friends (AR 331). Opelt testified that she slept approximately 12 hours a day because she did not have anything to do (AR 329). She claimed that she quit her job due to paranoia, and at the time she quit, was unable to leave her home (AR 331-332). She did acknowledge, however, that she felt she could return to full time work once she "[got] better" (AR 333-334).

At the second hearing, Opelt testified that her condition remained the same although she no longer slept as much since her medications were adjusted, and she continued to use marijuana

---

[4]Scores between 61 and 70 indicate "mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

because it made her feel better (AR 294; 304). She testified that she was not constantly paranoid, but experienced only episodes of paranoia lasting approximately one to two months (AR 295-296). During a paranoid episode, Opelt stated that she was unable to listen to the radio or watch television, stayed at home and avoided people, thought people were talking about her, heard voices, did not shower or bath and did not prepare meals (AR 298-299; 306). She claimed to have suffered from three paranoid episodes since May 2004, with the longest episode lasting three months (AR 300-301). Opelt indicated that work increased her paranoia and not working was therapeutic (AR 305).

The vocational expert was asked to consider an individual of Opelt's age, education, and vocational background, who was limited to performing simple, repetitive type tasks in a routine environment, with no more than incidental interaction with the public or close interaction with a supervisor, with no high stress activities, defined as high quotas or close attention to quality production standards, and who must avoid highly stimulative environments (AR 308-309). The expert testified that such an individual could work at a cleaning job, as a night guard and as a surveillance system monitor (AR 309). The expert further testified that such an individual would be unable to work if she were extremely impaired in her ability to tolerate stresses that were inherent in the workplace (AR 311).

The ALJ subsequently issued a written decision which found that Opelt was not entitled to a period of disability or DIB within the meaning of the Social Security Act (AR 13-20). Her request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 5-8). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988)

(quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

### III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ determined that Opelt's schizo-affective disorder was a severe impairment, but determined at step three that she did not meet a listing (AR 15). Despite her impairments, the ALJ found that she could: (1) perform work involving no more than incidental interaction with the public; (2) was limited to simple, repetitive, routine work not involving high stress, defined as work involving high quotas or close attention to quality production standards; (3) could perform no team work or work involving close interaction with supervisors; and (4) could perform no work occurring in a highly stimulating environment (AR 16). The ALJ concluded that she could perform the jobs cited by the vocational expert at the

administrative hearing (AR 19). The ALJ also concluded that Opelt's statements concerning the intensity, duration and limiting effects of her symptoms were not entirely credible (AR 16). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Opelt challenges the ALJ's evaluation of the medical evidence with respect to the opinions of her treating physicians, Dr. Yohe and Dr. Richards. Her argument in substance is that the ALJ failed to accord their opinions controlling weight and/or rejected their opinions on inadequate grounds in violation of the treating physician rule.

It is well settled in this Circuit that the opinion of a treating physician is entitled to great weight and can only be rejected on the basis of contrary medical evidence. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988). When medical testimony conflicts or is inconsistent, the ALJ is required to choose between them. *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981). In making that choice, a treating physician's conclusions are to be examined carefully and accorded more weight than a non-treating physician's opinion. *Podedworny v. Harris*, 745 F.2d 210, 217 (3rd Cir. 1984). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so. *Sykes v. Apfel,* 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

Dr. Yohe opined in August 2005 that Opelt was markedly limited in her ability to deal with the public and understand, remember and carry out complex job instructions, and was extremely limited in her ability to deal with work stresses, and that he considered her disabled for any gainful employment (AR 224-226). The ALJ declined to accord Dr. Yohe's opinion controlling weight based upon his review of Dr. Yohe's treatment notes, as well as psychiatric records generated by other physicians (AR 18).[5] A treating source's medical opinion concerning

---

[5]The ALJ also declined to accord his opinion controlling weight based, in part, upon his conclusion that the actual determination of disability is expressly reserved to the Commissioner (AR 17). "The ultimate decision concerning the disability of a claimant is reserved for the

the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2).

The ALJ concluded that Dr. Yohe's treatment notes did not reflect a degree of paranoia consistent with an inability to engage in any gainful employment (AR 18). In this regard, he observed:

> In the [sic] fact, the claimant still drives a vehicle and visits with friends, family, etc., playing cards once or twice a month (Exhibit 5E). Such activities are inconsistent with a marked limitation regarding dealing with the public. Further, although Dr. Yohe states that the claimant has had three to four lengthy hospitalizations since 1989 (Exhibit 8F), and the claimant has reported upwards of 10 hospital visits (Exhibit 7E), the record reflects no hospitalizations during the relevant time period due to the claimant's schizo-affective disorder. In fact, treatment records from November and December 2004 indicate Global Assessment of Functioning ("GAF") codes of 55, with the claimant's GAF rated at 60 in February 2005, and again at 60 upon her very next counseling visit in June 2005 (Exhibit 9F). Such GAF's indicate no worse than moderate mental functioning limitations (Diagnostic & Statistical Manual IV).

(AR 18).

The ALJ further concluded that Dr. Yohe's opinion was contradicted by the functional assessment of Dr. Thompson, a consulting examiner, whose assessment he found was more consistent with the entire record (AR 18). In May 2006 Dr. Thompson noted that Opelt reported that her medications were working well, she was more energetic, was able to perform household chores and interacted with family and friends (AR 273). Dr. Thompson found that her symptoms were controlled quite well with medication and concluded that her ability to understand and carry out simple instructions, interact with her supervisor and respond appropriately to changes in a routine work setting was only moderately impaired, but her ability to deal with the public and respond to work pressure was markedly impaired (AR 279). He assigned her a GAF score of 65

---

Commissioner." *Knepp v. Apfel,* 204 F.3d 78, 85 (3rd Cir. 2000).

to 70, which was consistent with only mild symptoms and difficulty in social and occupational functioning (AR 278).

Finally, the ALJ relied upon findings of Dr. Heil, the state agency reviewing psychologist, who engaged in a comprehensive review of the medical evidence and concluded that Opelt could meet the basic mental demands of competitive work on a sustained basis (AR 182). The ALJ concluded that Dr. Yohe's opinion lacked objective clinical evidence to support the functional restrictions imposed, and considered Dr. Heil's assessment reasonable in light of the evidence in the record (AR 18).

As to Dr. Richards, although the ALJ implicitly rejected his finding that Plaintiff was extremely limited in her ability to "interact with supervisors and deal with work stress in November 2005," for the same reasons that he failed to accord Dr. Yohe's conclusions substantial weight, he did credit Dr. Richards' conclusion that "the claimant [was] capable of working in a sheltered, noncompetitive workplace" (AR 18).

Based upon the above, we find no violation of the treating physician rule and conclude that the ALJ's decision is supported by substantial evidence.

## IV. Conclusion

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAURIE L. OPELT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 07-63 Erie |
| ) | |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

AND NOW, this 29th day of October, 2007, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 7] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 11] is GRANTED.  JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Laurie L. Opelt.  The clerk is directed to mark the case closed.


                                                s/ Sean J. McLaughlin
                                                United States District Judge

cm: All parties of record.